George Wentz, Jr. (*Pro hac vice application forthcoming*)
**Davillier Law Group, LLC**
414 Church St., Suite 308
Sandpoint, ID 83864
208-920-6140
Email: gwentz@davillierlawgroup.com

John W. Howard (SBN 802000)
Michelle D. Volk (SBN 217151)
Andrew G. Nagurney (SBN 301894)
**JW Howard/Attorneys, Ltd.**
701 B Street, Suite 1725
San Diego, California 92101
Tel: 619-234-2842 Fax: 619-234-1716
Email: Johnh@jwhowardattorneys.com
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| UNITED KP FREEDOM ALLIANCE, an unincorporated association; LE-LAN JORGENSEN, an individual; LAURA YVANOVICH, an individual; ROBIN DRUMMOND, an individual, TRACEY FORD, an individual; NATALIE OGLE, an individual; and NATHAN LEAVITT, an individual; <br><br> Plaintiffs, <br><br> v. <br><br> KAISER PERMANENTE (Kaiser Foundation Hospitals, Kaiser Foundation Health Plan, Inc., the Permanente Medical Group, Inc.) and DOES I-X; <br><br> Defendants. | Case No. <br><br> **COMPLAINT** <br><br> (Jury Trial Demanded) |

## INTRODUCTION

1.      On August 2, 2021, Kaiser Permanente announced that it would mandate that all of its over 200,000 employees nationwide be vaccinated for the SARS-CoV-2 virus ("COVID").

2.      Plaintiffs are Kaiser Permanente doctors, nurses, and support staff. This is their challenge to that mandate.

3.      Plaintiffs assert that a mandatory vaccine cannot be supported when:

     a.    Over 99.8% of all those who are infected and ill with COVID survive.

b. Those who survive obtain robust and durable natural immunity.

c. The natural immunity so obtained is superior to COVID vaccine-induced immunity.

d. The COVID vaccines are ineffective against the Delta strain of COVID, which the Center for Disease Control ("CDC") states is the dominant (>99%) strain throughout the United States.

e. The CDC Director acknowledged that the COVID vaccines do not prevent infection or transmission of COVID: "[W]hat the vaccines can't do anymore is prevent transmission."[1]

f. The CDC acknowledged that the vaccinated and unvaccinated are equally likely to spread the virus.[2]

g. The vaccines only reduce symptoms of those who are infected by COVID, but not transmission of the virus. They are, therefore, treatments, and not vaccines as that term has always been defined in the law.

h. The CDC changed its definition of "vaccine" in August 2021. The CDC formerly described vaccination as "the act of introducing a vaccine into the body to produce immunity to a specific disease." The definition has since been changed and now reads: "the act of introducing a vaccine into the body to produce protection to a specific disease."

i. This is a critical factual and legal distinction. Legal authority to mandate medical treatment only derives under public health regulations. As the CDC holds that Delta is the only strain; that the shots do not stop the transmission of Delta; and that vaccination is mere "protection" against a disease and not "immunity" against the disease; claiming this is a public health mandate is fallacious.

---

[1] As the Wuhan vaccine cannot stop transmission of Delta, several studies have proven that the vaccinated are passing the Delta strain amongst each other. For example, as reported by the NEJM, University of San Diego healthcare workers. The New England Journal of Medicine, *Resurgence of SARS-CoV-2 Infection in a Highly Vaccinated Health System Workforce* (September 30, 2021). https://www.nejm.org/doi/full/10.1056/NEJMc2112981.
[2] https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w

j.   The COVID vaccines cause a significantly higher incidence of injuries, adverse reactions, and deaths than any prior vaccines that have been allowed to remain on the market, and, therefore, pose a significant health risk to recipients, who are, by definition, healthy when they receive the COVID vaccines.

k.   Since, according to the CDC, the COVID vaccines do not prevent the infection or transmission of COVID, while at the same time, also according to the CDC, they result in a significant number of adverse events and deaths, there is no legal basis for mandating them, and Kaiser's mandate must therefore be struck down.

**PARTIES**

4.     Plaintiff Le-Lan Jorgensen is an employee of Kaiser Permanente who resides in Contra Costa County, California. She is a nurse anesthetist and has been an employee for eighteen years. She applied for an exemption to Kaiser's vaccine mandate due to her sincerely held religious beliefs, which was provisionally granted, and she is now compelled to be tested for COVID-19 weekly. She is not a member of a union.

5.     Plaintiff Laura Yvanovich is an employee of Kaiser Permanente who resides in Alameda County, California. She has worked for Kaiser Permanente for thirty-three years. She holds sincere religious beliefs that her body is a temple of God, and that submitting to vaccination or to testing violates her obligation to keep her body holy. She applied for an exemption to Kaiser's mandate to get vaccinated or tested; her exemption request was granted with regard to the vaccination but denied with regard to testing. She was terminated for failing to provide proof of vaccination or to submit to biweekly testing for COVID-19. She has not, to her knowledge, been infected with SARS-CoV-2. She is not a member of a union.

6.     Plaintiff Robin Drummond is an employee of Kaiser Permanente who resides in Ventura County, California. She has been an employee for approximately twenty-two years and has worked 100% remotely for approximately fifteen years. She holds a sincere personal belief that medical decisions are to be made by her and her alone as a personal healthcare decision. She

also sincerely believes that her natural immunity acquired through her infection and recovery from COVID-19 protect her. She applied for an exemption to Kaiser's vaccine mandate based upon her natural immunity, which was denied, and she has been placed on unpaid administrative leave because she did not provide proof of vaccination. A PCR test and an antibody test has confirmed that she has previously had and recovered from COVID-19. She is not a member of a union.

7.    Plaintiff Tracey Ford is an employee of Kaiser Permanente who resides in Riverside County, California. She has been an employee for approximately five years. She works 100% remotely. She applied for an exemption to Kaiser's vaccine mandate based upon her sincerely held religious beliefs, which was provisionally granted, and she is now compelled to provide biweekly tests for SARS-CoV-2. She is not a member of a union.

8.    Plaintiff Natalie Ogle is an employee of Kaiser Permanente who resides in Spokane County, Washington. She has worked for Kaiser Permanente for approximately five years. She works 100% remotely. She sincerely holds the religious belief that conscience should govern her actions, and anything else is an affront to human dignity as she understands the Catechism of the Catholic Church, and that cooperating with the use of aborted fetal cells in the creation and testing of the vaccines would be a grave moral evil. She applied for an exemption to Kaiser's vaccine mandate based upon these sincerely held religious beliefs, which was denied, and she has been placed on unpaid administrative leave because she did not provide proof of vaccination. She is not a member of a union.

9.    Plaintiff Nathan Leavitt is an employee of Kaiser Permanente who resides in Washington County, Oregon. He has worked for Kaiser Permanente for more than fifteen years. He works 100% remotely. He holds sincere religious beliefs that the use of aborted fetuses in vaccines violates God's plan for human life; that human life is a gift that must be protected; and that God granted free will to human beings and any affront to free will violates that gift from God. He has applied for an exemption to Kaiser's vaccine mandate, which was denied, and he has been

placed on unpaid administrative leave because he did not provide proof of vaccination. He has not, to his knowledge, been infected with SARS-CoV-2. He is not a member of a union. Collectively, Plaintiffs Jorgensen, Yvanovich, Drummond, Ford, Ogle, and Leavitt are referred to as the "Individual Plaintiffs". Plaintiff United KP Freedom Alliance is an unincorporated association. The Individual Plaintiffs are members, as are over 4,000 Kaiser employees across all states where Kaiser operates. The members of United KP Freedom Alliance (the "Association") include doctors, nurses, and support staff. They include Kaiser employees who work 100% remotely and Kaiser employees that work in hospitals. They include Kaiser employees who have had COVID, and those who have never had COVID. Members of the Association all refuse to take the vaccine for various reasons, including religious objections to taking the vaccine, and have been constructively terminated by Kaiser at this time through suspension without pay.  Each of the Association's members would otherwise have standing to sue in their own right;  the interests the Association seeks to protect are germane to the Association's purpose; and neither the claims asserted, nor the relief requested, requires the participation of individual members of the Association in the lawsuit.

1.     Defendant Kaiser Permanente (sometimes "Kaiser") is headquartered in Oakland, California. It comprises Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals and its subsidiaries, and the Permanente Medical Groups.[3]

**JURISDICTION AND VENUE**

2.     This Court has jurisdiction to hear this case under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States, as well as under 42 U.S.C. § 1983 in relation to Defendants' intent to deprive Plaintiffs of certain rights, privileges, and immunities as detailed herein.

3.     This Court has jurisdiction over the claims asserting violations of the laws and

---

[3] https://about.kaiserpermanente.org/who-we-are/fast-facts

Constitution of the State of California through its supplemental jurisdiction under 28 U.S.C. § 1367(a), as those claims are so closely related to the Plaintiffs' federal question and Section 1983 claims that they form part of the same case or controversy under Article III of the United States Constitution.

4.      This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a), and attorneys' fees and costs under 42 U.S.C. § 1988.

5.      The Northern District of California, Oakland Division is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the district in which Defendants reside, exercise their authority in their official capacities, and/or have threatened to deprive Plaintiffs of the rights and liberties under the laws and Constitution of the United States, and, in addition thereto, to violate the laws and Constitution of the State of California, as further alleged herein. It is also the district in which a substantial part of the events giving rise to Plaintiffs' claims have occurred and continue to occur.

## GENERAL ALLEGATIONS

**A.      Kaiser Permanente is a State Actor**

6.   A 2020 article in the journal Frontiers in Public Health explored the role of medical professionals in COVID-related policymaking. The authors explain:

> In the 2020 COVID pandemic, medical experts (virologists, epidemiologists, public health scholars, and statisticians alike) have become instrumental in suggesting policies to counteract the spread of coronavirus. Given the dangerousness and the extent of the contagion, almost no one has questioned the suggestions that these experts have advised policymakers to implement. Quite often the latter explicitly sought experts' advice and justified unpopular measures (e.g., restricting people's freedom of movement) by referring to the epistemic authority attributed to experts.
>
> . . .
>
> In the context of the coronavirus pandemic, most world leaders began appealing to medical experts and to their epistemic authority to justify the implementation of unpopular measures (such as enforced quarantine) considered the most suitable to slow down the spread of COVID. This step has been motivated by, at least, two

*elements. On the one hand, political authorities perceived that their ordinary actions were ineffective and had to make full use of biomedical expertise, often essentially delegating strategies and decisions to experts (e.g., implementing them and resolving any conflicts between different social actors; for example between trade unions and employers . . .). On the other hand, if leaders resort to the epistemic authority of experts, they are prima facie relieved of responsibility for the choices made, especially if they are unwelcome by public opinion, are ineffective, or have unforeseen negative side effects. In reality, this dynamic that leads experts to assume a central role in politics can—as we shall see below—create problems in itself, since the strategies proposed by experts are often far from neutral with respect to the values that a pluralistic society considers relevant.*[4]

7.     Kaiser is the nation's largest integrated, nonprofit, health care organization. However, it is also heavily involved in setting healthcare policy both locally and nationally, particularly with regard to COVID.

8.     Kaiser has both set state and federal policy for COVID vaccines and has carried that policy out.  Kaiser has worked in partnership with state and federal government to develop and implement the policy complained of herein.  Kaiser is, in fact, acting jointly with, and for and on behalf of, both the State of California and the Federal Government.

**B.     Kaiser Has Been Responsible for Coordinating and/or Setting National Policy**

9.     In January of 2021, Kaiser's Chief Health Officer, Bechara Choucair, was selected by the Biden Administration "to be the nation's COVID vaccine coordinator."[5] As of October 5, 2021, he is still listed as an executive on Kaiser's website.[6]

10.     Key governmental entities instrumental to setting COVID policy have been controlled by Kaiser employees since the arrival of the COVID virus in the United States, and still are as of the date of filing.

11.     For example, the Advisory Committee on Immunization Practices ("ACIP") is responsible for advising the Food and Drug Administration ("FDA") in the issuance of Emergency Use Authorizations for vaccines.

---

[4] https://www.frontiersin.org/articles/10.3389/fpubh.2020.00356/full (internal footnotes omitted from quote).
[5] https://www.politico.com/news/2020/12/29/biden-coronavirus-response-coordinators-451996
[6] https://www.kpihp.org/bio/bechara-choucair/

12.     "ACIP statements are official federal recommendations for the use of vaccines and immune globulins in the U.S., and are published by the CDC."[7]

13.     In December of 2020, ACIP recommended to the FDA that it approve the three vaccines that ultimately received Emergency Use Authorization from the FDA; J&J, Pfizer, and Moderna.[8]

14.     Upon information and belief, the majority of the members of ACIP who issued the December, 2020 recommendation were Kaiser employees, including:

    a.   Matt Daley, Kaiser Permanente;

    b.   Elyse Kharbanda, Kaiser Permanente;

    c.   Nicky Klein, Kaiser Permanente;

    d.   Allison Naleway, Kaiser Permanente;

    e.   Hung-Fu Tseng, Kaiser Permanente; and

    f.   Katherine Yih, Kaiser Permanente.

15. Another critical agency in the rollout and ongoing administration of the COVID vaccines is the Vaccine Safety Datalink ("VSD").

16.     "The VSD started in 1990 and continues today in order to monitor the safety of vaccines and conduct studies about rare and serious adverse events following immunization."[9]

17.     A primary role of VSD is "to provide information to committees who make recommendations for the nations."[10]

18.     The VSD consists of the following nine health organizations:

    a.   Kaiser Permanente Washington
    b.   Kaiser Permanente Northwest, Oregon
    c.   Kaiser Permanente Northern California
    d.   Kaiser Permanente Southern California
    e.   Kaiser Permanente Colorado
    f.   Marshfield Clinic Research Institute
    g.   Health Partners
    h.   Harvard Pilgrim, Massachusetts

---

[7] https://www.bionity.com/en/encyclopedia/Advisory_Committee_on_Immunization_Practices.html
[8] https://www.cdc.gov/mmwr/volumes/69/wr/mm695152e2.htm
[9] https://www.cdc.gov/vaccinesafety/ensuringsafety/monitoring/vsd/index.html
[10] https://www.cdc.gov/vaccinesafety/ensuringsafety/monitoring/vsd/index.html

1

i.  CDC Atlanta, Georgia

2

19.  It is clear on its face that five of the nine organizations are Kaiser.

3

20.  Upon further research, it is also clear, however, that Kaiser, in addition, also

4

controls or has substantial cooperative relationships with three of the non-Kaiser organizations:

5

Marshfield Clinical Research Institute, Health Partners, and Harvard Pilgrim.

6

21.  The Interim Executive Director of Marshfield Clinic Research Institute is Dr.

7

Jacobsen,[11] who also directs the research programs for Kaiser Permanente Southern California

8

and the Department of Research & Evaluation. According to Kaiser, "Dr. Jacobsen serves as site

9

principal investigator for the Vaccine Safety Datalink (VSD), funded by the Centers for Disease

10

Control and Prevention."[12]

11

22.  Health Partners and Harvard Pilgrim are both partnered with Kaiser in a program

12

called Sentinel, which is a national data network set up in 2009 to monitor the performance of

13

FDA-regulated medical products.[13]

14

23.  The VSD has been, and still is, heavily involved in setting national policy with

15

regard to COVID and is controlled by Kaiser.

16

24.  Upon information and belief, Dr. Lisa Jackson, a former member of the FDA

17

Vaccines and Related Biological Products who is currently a senior investigator at Kaiser

18

Permanente Washington Health Research Institute, and is also a physician at Kaiser Permanente

19

Medical Group, was the final link in the development of the COVID vaccines.

20

25.  Thus, Kaiser played a key role in Operation Warp Speed, and the rollout of the

21

COVID vaccines.

22

23

24

25

26

27

[11] https://marshfieldresearch.org/research-institute-leadership

[12] https://www.kp-scalresearch.org/dr-steven-jacobsen-of-kaiser-permanente-elected-president-elect-of-the-american-college-of-epidemiology/

28

[13] Sentinelinitiative.com, *Who Is Involved*, https://www.sentinelinitiative.org/about/who-involved.

### C.      Kaiser Has Been Responsible for Coordinating and/or Setting California Policy

26.      In January of 2021, California Governor Gavin Newsom chose Blue Cross Blue Shield and Kaiser to lead the state's vaccination push14 due to Kaiser's "expertise" in the field.15

27.      On January 23, 2021, Kaiser and the State of California signed a memorandum of understanding ("MOU") which required Blue Cross Blue Shield to "cooperate and coordinate with Kaiser[.]"16

28.      The MOU further provided as follows: "In furtherance of Kaiser's mission and commitment to its members and others residing in the communities it serves, Kaiser enters into this MOU with the Agency, pursuant to which Kaiser will work collaboratively with the Agency and with Blue Shield, in its capacity as TPA, to vaccinate individuals across the State (the 'Vaccination Efforts')."

29.      In the MOU, both parties recognized Kaiser's market dominance: "Kaiser, in collaboration with The Permanente Medical Group, Inc. and the Southern California Permanente Medical Group, (together, 'Kaiser Permanente'), provides health care coverage and care to one in four Californians."

30.      As part of entering into the MOU, Kaiser required the State of California to "recognize … that a successful Vaccination Effort will include vaccination of all eligible individuals across the state."

31.      The MOU also recognized that the Vaccination Efforts and the MOU were being undertaken to advance Kaiser and the State of California's "shared goal" to vaccinate the residents of California.

32.      On March 23, 2021, Kaiser issued a "Vaccine Confidence Toolkit" for healthcare systems. This toolkit outlined a "[t]actic" of "[s]eek[ing] regulatory relief that will allow providers to have more flexibility in achieving shared [vaccination] objectives[.]" It suggested

---

14 https://www.modernhealthcare.com/insurance/confusion-over-newsoms-choice-blue-shield-kaiser-lead-vaccination-push
15 https://files.covid19.ca.gov/pdf/Kaiser-foundation-GovOps-MOU.pdf
16 https://files.covid19.ca.gov/pdf/Kaiser-foundation-GovOps-MOU.pdf

1
2
that health systems: "Monitor, coordinate support, and be engaged at all levels[,]" state and federal.[17]

3
4   33.     On April 7, 2021, the Kaiser Family Foundation issued a legal brief on the
5   permissibility of vaccine mandates. In the section entitled "Can private employers mandate
6   vaccines" they wrote: "States may prohibit vaccine mandates as a condition of employment and
7   instead require that employees have the ability to opt out. Employers also may be subject to
8   collective bargaining agreements that require them to negotiate with employee unions before
9   imposing a vaccine mandate as a condition of employment. Employer vaccine mandates are
    subject to exemptions based on disability or religious objection[.]"[18]

**D.   Kaiser Mandates Vaccines for All Employees, to Lead the Way for National Policy**

10
11
12   34.     On August 2, 2021, Kaiser issued a press release announcing it was mandating
13   that all employees and physicians take the COVID vaccine. The "target date" by which all
14   employees and physicians were to be vaccinated was September 30, 2021.[19]

15   35.     Documents sent to employees by Kaiser indicate that employees who have not
16   been vaccinated by September 30, 2021, or otherwise excused from the requirement, will be
17   place on leave without pay, and will be terminated by no later than December 30, 2021.

18   36.     Kaiser's CEO is quoted in the press release as saying: "We encourage all health
19   systems and business and industry leaders across the country to play a role in ending the
20   pandemic by doing the same."[20] The press release noted: "Kaiser Permanente is committed to
21   helping shape the future of health care."[21]

22
23
24
25   [17] https://about.kaiserpermanente.org/content/dam/kp/mykp/documents/instructions/covid19-vaccine-confidence-toolkit.pdf p. 32 (emphasis supplied).
    [18] https://www.kff.org/coronavirus-COVID/issue-brief/key-questions-about-COVID-vaccine-mandates/
26   [19] https://about.kaiserpermanente.org/our-story/news/announcements/protecting-health-and-safety-through-vaccination
27   [20] https://about.kaiserpermanente.org/our-story/news/announcements/protecting-health-and-safety-through-vaccination
28   [21] https://about.kaiserpermanente.org/our-story/news/announcements/protecting-health-and-safety-through-vaccination

37.     On August 30, 2021, Fox 26 News reported: "On December 1, [Kaiser] employees who are not fully vaccinated or who do not have an approved exemption will no longer be eligible to continue employment and will be terminated."22

38.     On August 2, 2021, Michelle J. Gaskill-Hames, Northern California Senior Vice President, Hospital and Health Plan Operations, stated: "[W]e believe we've got to lead this across the country."23

39.     In connection with mandated vaccination and testing, Kaiser entered into a contract with Fulgent Genetics, Inc. ("Fulgent") for which Kaiser collected genetic samples through testing and allowed the use the genetic information collected through this process to be shared not just with Fulgent but wrongfully shared by Fulgent at will pursuant to its contract with Kaiser through the use of blockchain technology that cross-references same with intimate personal and financial information and without reasonable control to protect the privacy of Plaintiffs and all of those who are similarly situated.

40.     As a result of Kaiser's absolute and mandated vaccination orders, Kaiser has wrongfully and in violation of law and the Constitutions of the United States and California threatened the Plaintiffs and others similarly situated with loss of their jobs, benefits, retirement benefits and careers. Those threats, and the knowledge that Kaiser has released the most intimate details of Plaintiffs' physical health and genetics, have caused the Plaintiffs to suffer sleeplessness, fatigue, fear, apprehension, anxiety, and nervousness, to their damage in an amount that has not, as yet, been fully ascertained. Plaintiffs will seek leave of court to allege the full extent of said damage when same has been fully ascertained.

41.     In addition, Kaiser has threatened the Plaintiffs with termination of their employment without due process or, for that matter, any process, in violation of the contract between them and memorialized in Kaiser's statements of employment policy outside of the collective bargaining agreement to which others of Kaiser's employees are subject.

---

22 https://kmph.com/news/local/local-nurse-speaks-out-about-vaccine-mandate
23 https://abc7news.com/kaiser-permanente-vaccine-requirements/10926410/

42.     On August 4, 2021, the Coalition of Kaiser Permanente Unions ("Coalition") sent Kaiser a "Demand to Bargain" letter over the vaccine mandate. The Coalition said:

> We were notified of the planned vaccination mandate on the afternoon of Friday, July 30th and the mandate was issued the following Monday, leaving no opportunity for Coalition leaders and members to provide any input into the process. Abandoning the partnership process and sidestepping CKPU's involvement in the crafting of the vaccine mandate does not further the public health goals and safety issues that we are all very concerned about.
>
> . . .
>
> We strongly believe that we can most effectively address these issues, and those yet unseen, by working together in partnership and with the inclusion of frontline workers' experience and expertise, rather than Kaiser acting unilaterally and without our members' input.[24]

**E.     Kaiser and the State of California Issued Vaccine Mandates Virtually Simultaneously to Prevent Healthcare Workers From Leaving to Take Jobs at Hospitals Without Mandates.**

43.     On August 5, 2021, the state of California announced it would impose a vaccine mandate on healthcare workers.[25] Healthcare facilities around the country were already dealing with critical staffing shortages.[26] As reported by ABC7 News: "An unfortunate response from this mandate has led to many hospitals and healthcare organizations losing their healthcare workers because they say they would rather resign than be forced to get the Covid vaccine."

44.     The New York Times reported that "[California] health care work forces and their unions include a striking number of vaccine resisters."

45.     The New York Times also reported on Kaiser employee Gabriel Montoya's effort to get the emergency room staff at Kaiser Permanente Downey California Medical Center vaccinated as follows: "[H]e and his fellow union leaders have had trouble getting even half of the 300 rank-and-file members in the hospital's emergency room vaccinated . . . 'I hear the

---

[24] https://www.unioncoalition.org/wp-content/uploads/2021/08/KP-Vaccine-Mandate-CKPU-Demand-to-Bargain-8.4.21-FINAL.pdf
[25] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID/Order-of-the-State-Public-Health-Officer-Health-Care-Worker-Vaccine-Requirement.aspx, https://krcrtv.com/newsletter-daily/hospitals-concerned-about-losing-employees-after-vaccine-mandate-announcement
[26] https://www.marketplace.org/2021/08/17/hospitals-are-short-staffed-and-running-out-of-beds-again/

water-cooler conversations. What are they going to do if we refuse? Get rid of us all when they're having a spike in cases?'"[27]

## F. The Federal Government Ordered National Mandates after Meeting With the CEO of Kaiser

46.     On August 11, 2021, President Biden met with Kaiser's CEO, "expressed his optimism that additional employers would follow suit" and "noted that the federal government will continue to support employers as they require COVID vaccinations."[28]

47.     On August 23, 2021, Bechara Choucair called on private employers to mandate vaccines, saying: "We truly believe that employers, whether it's state government, local government, private businesses, universities, colleges, community colleges, we all have a role to play when it comes to vaccinations. We are leading by example from the federal government."[29] The next day he stated: "We have to look at all the tools and try to get as many people vaccinated as possible[.]"[30]

48.     On August 31, 2021, Kaiser Health Network put out an article entitled "Lack of a Vaccine Mandate Becomes Competitive Advantage in Hospital Staffing Wars"[31] The article noted that health care workers, already in short supply, were fleeing states and employers with vaccine mandates and seeking job opportunities in environments that did not have vaccine mandates.

49.     On September 9, 2021, President Biden announced that the Department of Labor was developing an emergency order requiring every hospital, healthcare facility, and large employer in the country to mandate the COVID vaccine for its employees. He also issued an executive order requiring all federal contractors mandate vaccines for their employees.[32]

---

[27] https://www.nytimes.com/2021/07/27/us/california-vaccine-mandate.html
[28] https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/11/readout-of-president-bidens-meeting-with-business-university-and-health-care-leaders-on-COVID-vaccination-requirements/
[29] https://miami.cbslocal.com/2021/08/23/white-house-vaccination-coordinator-fda-pfizer-approval/ (emphasis supplied).
[30] https://www.nbcmiami.com/news/jj-says-covid-booster-shot-shows-rapid-and-robust-antibody-increase/2537293/
[31] https://khn.org/news/article/covid-hospital-staff-shortage-lack-of-mandate-competitive-advantage-worker-recruitment-retention/
[32] https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-COVID-pandemic-3/

1   50.    The same day, Bechara Choucair stated in an interview that "vaccine
2   requirements [are] one tool in our toolbox" to ensure that all Americans received a vaccine.[33]
3   51.    On September 10, 2021, Kaiser's CEO expressed Kaiser's "support" for the
4   federal government's employer vaccine mandate stating: "The president's action demonstrates
5   that government alone cannot solve this challenge. We support the engagement of the private
6   sector to play more of a role in helping close the vaccination gap in our communities."[34]

**G.     State Actor Summary**

52.    Plaintiff believes, and therefore alleges:

a.   That implementing and enforcing a vaccination mandate in response to a pandemic
is traditionally a public function. *See also S. Bay United Pentecostal Church v.
Newsom*, 140 S. Ct. 1613, 1613, 207 L.Ed.2d 154, 155 (2020), 141 S. Ct. 10, 12,
208 L.Ed.2d 155, 156 (2020) ("Our Constitution principally entrusts the safety and
the health of the people to the politically accountable officials of the States to guard
and protect.") (quotations omitted), *Jacobson v. Massachusetts*, 197 U.S. 11, 29,
25 S. Ct. 358, 362, 49 L.Ed. 643 (1905) ("[I]t is equally true that in every well-
ordered society charged with the duty of conserving the safety of its members the
rights of the individual in respect of his liberty may at times, under the pressure of
great dangers, be subjected to such restraint, to be enforced by reasonable
regulations, **as the safety of the general public may demand**.") (emphasis
supplied).

b.   That Kaiser deliberately caused the executive branch of the federal government to
impose the federal vaccine mandate or, alternatively, Kaiser's deliberate actions
were a significant reason that such a mandate was implemented.

c.   That Kaiser coordinated with the executive branch of the federal government
regarding the timing and implementation of its own vaccine mandate.

---

[33] https://www.thedenverchannel.com/news/local-news/how-does-bidens-new-vaccine-mandate-impact-colorado-employees
[34] https://about.kaiserpermanente.org/our-story/news/our-perspective/our-support-for-federal-vaccine-requirements

d.  That Kaiser's behavior with respect to the state of California was similar.

e.  That one of Kaiser's purposes in undertaking this deliberate program was to circumvent Plaintiffs' employment contracts.

f.  That another one of Kaiser's purposes in undertaking this deliberate program was to ensure that members of its workforce who did not wish to take the vaccine could not find other employment opportunities in their field in California or elsewhere in the country. Thus, Kaiser ensured it could maintain its vaccine mandate without hemorrhaging employees.

g.  That Kaiser knew that the federal government was going to implement the federal vaccine mandate at the time that Kaiser imposed its own mandate.

h.  That one of Kaiser's purposes in announcing its own vaccine mandate was to facilitate the federal government's adoption of the federal vaccine mandate.

i.  Ultimately, the government has so far insinuated itself into a position of interdependence with Kaiser that it must be recognized as a joint participant in its vaccine mandate. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961) (upholding injunction prohibiting racial discrimination by privately-owned restaurant leasing space in publicly-owned parking deck, and stating, "[t]he State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment[.]"). (*Id.*)

j.  At the very least, Kaiser's vaccine mandate constitutes performance of a public function with the government's acquiescence. *See Marsh v. Alabama*, 326 U.S. 501, 507, 66 S. Ct. 276, 279, 90 L.Ed. 265, 269 (1946) ("And even had there been no express franchise but mere acquiescence by the State in the corporation's use of its property as a segment of the four-lane highway, operation of all the highway, including the segment owned by the corporation, would still have been

performance of a public function and discrimination would certainly have been illegal."). (*Id.*)

    k.  That Kaiser's vaccine mandate may be fairly treated as state action and subjected to a constitutional analysis.

    l.  That discovery will further substantiate these contentions.

53.    Ultimately, the reason that the Constitution does not generally apply to private employers is that employees are free to leave if they are unhappy with the conditions of their employment. *See Belgau v. Inslee*, 975 F.3d 940, 952 (9th Cir. 2020) ("We note that there is an easy remedy for Washington public employees who do not want to be part of the union: they can decide not to join the union in the first place, or they can resign their union membership after joining. Employees demonstrated the freedom do so, subject to a limited payment commitment period. In the face of their voluntary agreement to pay union dues and in the absence of any legitimate claim of compulsion, the district court appropriately dismissed the First Amendment claim against Washington.").

54.    Indeed, in dismissing a recent suit against the Houston Methodist Hospital's employee vaccine mandate, the United States District Court for the Southern District of Texas held "This is not coercion . . . Bridges can freely choose to accept or refuse a COVID vaccine; however, if she refuses, she will simply need to work somewhere else." [35] *See also Belgau v. Inslee*, 975 F.3d 940, 952 (9th Cir. 2020).

55.    However, Defendant and the state and federal government have worked hand in hand, as a team, to ensure that this is the situation no longer. Plaintiffs are not free to leave Kaiser and take another job in their field that does not require the COVID vaccine. There is nowhere else they can go.

**COVID is Not Smallpox**

---

[35] https://www.documentcloud.org/documents/20860669-houston-methodist-lawsuit-order-of-dismissal (no constitutional causes of action were alleged).

## A.    The Underlying Statistics Surrounding COVID Are Flawed

56.    On January 30, 2020, the World Health Organization declared a public health emergency of international concern due the SARS-CoV-2 virus ("COVID").

57.    On January 31, 2020, President Trump first issued a public health state of emergency in the United States under the Public Health Service Act due to COVID.

58.    Also on January 31, 2020, Secretary of Health and Human Services Alex M. Azar II, issued a Declaration of a Public Health Emergency effective as of January 27, 2020. This declaration has been renewed thereafter on April 21, 2020, July 23, 2020, October 2, 2020, January 7, 2021, April 15, 2021, and July 19, 2021.

59.    President Trump issued a subsequent declaration of emergency under the Stafford Act and National Emergencies Act on March 13, 2020, due to COVID.

60.    A third declaration of emergency was issued by President Trump on March 18, 2020, under the Defense Production Act due to COVID.

61.    On February 24, 2021, President Biden extended President Trump's March 13, 2020 declaration of emergency, stating as a reason for doing so that more "than 500,000 people in this Nation have perished from the disease."[36]

62.    Thus, the United States has been in a constant state of emergency due to COVID (the "COVID Emergency") since January 31, 2020, a period of over twenty months.

63.    The COVID Emergency has been used to justify lockdowns, banning of worship services, mandatary masks, vaccine passports, and now mandatory vaccinations such as the vaccination requirement Kaiser Permanente has placed on each of its employees upon penalty of termination.

64.    Never in this history of this nation have its citizens been subjected to such invasions of their individual rights and liberties.

---

[36] President Joseph R. Biden, Jr., *Notice on the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic* (February 24, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/24/notice-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic/.

**i. The Use of the PCR Test is Significantly Flawed, Resulting in Dramatic Overstatement of COVID Cases**

65.     The Covid Emergency is based upon statistics that are flawed for at least the following reasons:

a.  Every statistic regarding COVID is based upon the PCR test, which is a limited test that cannot, on its own, determine whether a test subject is infected with COVID absent an examination by a medical doctor;

b.  The PCR test is highly sensitive, with the result of the test being dependent upon the cycle threshold ("CT") at which the test is conducted;

c.  Dr. Fauci has stated that a test conducted at a CT of over 35 is useless;[37]

d.  Studies have confirmed Dr. Fauci's conclusion, showing that tests conducted using CT values over 35 have yielded up to eighty percent (80%) false positives;[38]

e.  Despite this known sensitivity, the PCR tests were mass distributed in the United States without training, were used by technicians who were not made aware of the underlying flaw in the test,[39] and were operated at a CT value in excess of 35

---

[37] YouTube.com, *Dr. Tony Fauci - PCR cycles* (October 30, 2020), https://www.youtube.com/watch?v=A867t1JbIrs; *see* NYTimes.com, *Your Coronavirus Test Is Positive. Maybe It Shouldn't Be*. August 29, 2020), https://www.nytimes.com/2020/08/29/health/coronavirus-testing.html.
[38] Corman-Drosten Review Report, *External peer review of the RTPCR test to detect SARS-CoV-2 reveals 10 major scientific flaws at the molecular and methodological level: consequences for false positive results*, Section 3 (November 27, 2020), https://cormandrostenreview.com/report/; *see* The Lancet *Clarifying the evidence on SARS-CoV-2 antigen rapid tests in public health responses to COVID-19* (February 17, 2021), ("This suggests that 50–75% of the time an individual is PCR positive, they are likely to be post-infectious."), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00425-6/fulltext#%20; DOI: https://doi.org/10.1016/S0140-6736(21)00425-6;
*see also* https://www.aerztezeitung.de/Wirtschaft/80-Prozent-der-positiven-Corona-Schnelltests-falsch-positiv-421053.html (July 4, 2020), (The fact that the high rate of false positive tests in large-scale testing in the population occurs at a time of low viral incidence is demonstrated in the article from the German Ärztezeitung. At the end of the regular cold season (May), about 50% of rapid tests were already reported as false positive, and this rate increased until it reached 80% false positive tests in June.); *compare Comparison of seven commercial SARS-CoV-2 rapid point-of-care antigen tests: a single-centre laboratory evaluation study* (July 2021), ("false-positives do occur with AgPOCTs at a higher rate than with RT-rtPCR."), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8026170/. DOI: 10.1016/S2666-5247(21)00056-2.
[39] NPR *CDC Report: Officials Knew Coronavirus Test Was Flawed But Released It Anyway* (November 6, 2020), https://www.npr.org/2020/11/06/929078678/cdc-report-officials-knew-coronavirus-test-was-flawed-but-released-it-anyway.

1    routinely, therefore, delivering results that were, according to Dr. Fauci and a broad
2    consensus of experts in the area, useless;[40] and

3    f.   The PCR test is incapable of distinguishing a live particle of a virus from a dead
4         one, and as a result, even a positive test result does not mean that the test subject is
5         infected or contagious with COVID, analogous to a test that could identify car parts
6         (such as an axle, wheels, engine) but not determine if those car parts were in fact,
7         a working car.

8
9
### ii.  The Asymptomatic Spreader is a Myth

10    66.    Due to the numerous flaws in the fundamental test upon which all statistics
11    underlying the COVID Emergency are based, and the high level of resulting false positives,
12    many have incorrectly concluded that asymptomatic people, who in the past would simply have
13    been referred to as "healthy people," are somehow contagious and are spreading the disease.

14    67.    Policy decisions at the state and federal level rest upon this myth. For example,
15    mandatory masking of healthy people is based upon this myth. Social distancing is based upon
16    this myth as well. The policy that perfectly healthy, non-contagious people must be vaccinated to
17    interact with and participate in society is based in large degree upon this myth. With regard to
18    flawed statistics, mass PCR testing of the entire population has been based upon this myth.[41]
19    There is no reason to test perfectly healthy asymptomatic people absent the belief that
20    asymptomatic people can spread COVID.

21    68.    However, the assumption that people with no symptoms can spread the disease is
22    false. As Dr. Fauci stated during a September 9, 2020: "[E]ven if there is some asymptomatic
23    transmission, in all the history of respiratory borne viruses of any type, asymptomatic
24    transmission has never been the driver of outbreaks. The driver of outbreaks is always a

25
26
[40] YouTube.com, *Dr. Tony Fauci - PCR cycles* (October 30, 2020),
27    https://www.youtube.com/watch?v=A867t1JbIrs.
[41] Corman-Drosten Review Report, *External peer review of the RTPCR test to detect SARS-CoV-2 reveals 10 major
28    scientific flaws at the molecular and methodological level: consequences for false positive results.* (November 27,
2020), https://cormandrostenreview.com/report/.

symptomatic person, even if there is a rare asymptomatic person that might transmit, an epidemic is not driven by asymptomatic carriers."[42]

69.     Due to the incorrect assumption that asymptomatic people could spread the disease, mass testing has been instituted of the population at large. Due to the numerous flaws in the PCR test stated above, this mass testing has resulted in dramatically inflated case numbers that do not reflect reality and falsely overstate the number of COVID cases.

70.     As a result, the data regarding COVID cases being used to shape public policy is highly inflated.

### iii.  The COVID Hospitalization Count is Highly Inflated

71.     Every patient that is admitted to a hospital is subject to a PCR test due to the perceived COVID Emergency.

72.     The PCR test used upon admission is subject to the numerous flaws identified above, and, therefore, results in the dramatic inflation of COVID patients who have been hospitalized.

73.     Moreover, the CARES Act increases reimbursements to hospitals for all patients who have been diagnosed with COVID, creating an economic incentive for hospitals to find a COVID diagnosis.

74.     As a result, the COVID hospitalization data being used to shape public policy is highly inflated.

### iv.  The COVID Death Count is Highly Inflated

75.     On March 24, 2020, the CDC issued COVID Alert Number 2.[43] This Alert substantially changed how the cause of death was to be recorded exclusively for COVID. The modification ensured that in any case where the deceased had a positive PCR test for COVID, then COVID was listed as the cause of death.[44]

---

[42] https://www.bmj.com/content/371/bmj.m4695 and YouTube.com, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China | January 28,* 2020 (January 28, 2020).
[43] National Vital Statistics System, *COVID-19 Alert No. 2* (March 24, 2020),
https://www.cdc.gov/nchs/data/nvss/coronavirus/Alert-2-New-ICD-code-introduced-for-COVID-19-deaths.pdf.
[44] *Id.*

76.     Prior to this March 24, 2020, change in procedure, COVID would only have been listed as the cause of death in those cases where COVID was the actual cause of death. If the deceased had a positive PCR test for COVID, but had died of another cause, then COVID would have been listed as a contributing factor to the death, but not the cause.[45]

77.     The 2003 CDC Medical Examiner's and Coroner's Handbook on Death Registration and Fetal Death Reporting states that in the presence of pre-existing conditions infectious disease is recorded as the contributing factor to death, not the cause.[46]  This was always the reporting system until the death certificate modification issued by the CDC on March 24, 2020.[47]

78.      This death certificate modification by the CDC was not made for any other disease; only COVID. Accordingly, a double standard was created for the recordation of deaths, skewing the data for all deaths after March 24, 2020, reducing the number of deaths from all other causes, and dramatically increasing the number of deaths attributed to COVID.

79.     As a result, the COVID death data used to shape public health policy is significantly inflated.[48]

**v.  COVID Has an Extremely High Survivability Rate**

80.     According to the CDC the survivability of COVID-19 is extraordinarily high. Survival rates under age 20 is 99.997%, 20-50 is 99.98%, 50-70 is 99.5% and 70+ is 94.6%. These figures calculate the percentage of confirmed COVID infected patients who survive.

81.     By comparison, the smallpox epidemic of the early 1900s is reported to have been fatal to over 30% of those who contracted it, according to the FDA.[49]

**vi.     COVID Survivors Enjoy Robust Natural Immunity**

---

[45] *Id.*

[46] Medical Examiners' and Coroners' Handbook on Death Registration and Fetal Death Reporting, 2003 Revision. CDC, 2003. https://www.cdc.gov/nchs/data/misc/hb_me.pdf.

[47] National Vital Statistics System, *COVID-19 Alert No. 2* (March 24, 2020), https://www.cdc.gov/nchs/data/nvss/coronavirus/Alert-2-New-ICD-code-introduced-for-COVID-19-deaths.pdf.

[48] CDC, *COVID-19 Forecasts: Deaths* (last accessed September 30, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/forecasting-us.html

[49] *See* CDC, *History of Smallpox*, ("On average, 3 out of every 10 people who got it died."), https://www.cdc.gov/smallpox/history/history.html. /

82.     Those who recover from infection from COVID, over 99% of those who are infected, enjoy robust and durable natural immunity. Natural immunity is superior to vaccine-induced immunity resulting from the COVID vaccines, which do not prevent re-infection or transmission of COVID, and do not prevent infection, re-infection or transmission of the current Delta strain.

### B.     Mandatory COVID Vaccines Are Contrary to Public Policy.

83.     COVID vaccines are not vaccines in the traditional sense.  In fact, the FDA classifies them as "CBER-Regulated Biologics" otherwise known as "therapeutics" which falls under the "Coronavirus Treatment Acceleration Program."[50]

84.     The vaccine is misnamed since it does not prevent either re-infection or transmission of the disease, the key elements of a vaccine. The CDC has publicly stated that the vaccine is effective in reducing the severity of the disease but not infection, re-infection, or transmission.  The injection is a treatment and not a vaccine.

85.     The current strain of COVID is the Delta strain.[51] The CDC Director has stated that the vaccines do not stop the transmission of the Delta strain. Studies show the Delta strain passes easily amongst vaccinated persons.[52] The CDC website states: "… preliminary evidence suggests that fully vaccinated people who do become infected with the Delta variant can spread the virus to others."[53]

86.     The effectiveness of the COVID vaccines has been determined to wane rapidly. Israel, the most vaccinated and studied nation, now expires the vaccine's effectiveness at six months.[54]  The requirement for booster shots due to this waning of effectiveness has been

---

[50] FDA, *Coronavirus (COVID-19) | CBER-Regulated Biologics*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics; FDA, *Coronavirus Treatment Acceleration Program (CTAP)*, https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap.
[51] CDC, Variant Proportions (last accessed September 30, 2021), https://covid.cdc.gov/covid-data-tracker/#variant-proportions.
[52] The Lancet, Transmission of SARS-CoV-2 Delta Variant Among Vaccinated Healthcare Workers, Vietnam (August 10, 2021) https://ssrn.com/abstract=3897733
[53] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html
[54] https://www.businessinsider.com/israel-vaccine-pass-to-expire-after-6-months-booster-shots-2021-9

recognized by the CDC, which initially recommended no booster shots, then annually, then at 8 months and then 6 months.

87.     Those countries with the highest rates of COVID vaccination also experience the highest rates of infection. Those counties with the highest rates of vaccination also have the highest rates of hospitalization and severe illnesses with regard to the Delta strain, which is the current strain.

**C.     VAERS Reports Significant Injury**

88.     As part of the 1990 Public Readiness and Emergency Preparedness Act, the FDA and CDC created the Vaccine Adverse Event Reporting System (VAERS) to receive reports about suspected adverse events that may be associated with vaccines. VAERS is intended to serve as an early warning system to safety issues.

89.     It has been well established even prior to COVID that only 1-10% of adverse events are reported.[55] This is known as the "Under-Reporting Factor". While many reported adverse events are mild, about 15% of total adverse events are found to be serious adverse events.[56]

90.     VAERS reports regarding the COVID vaccines are unusually high.

Figure 1:  Bar plots showing the number of VAERS reports (left) and reported deaths (right) per year for the past decade. (2021 is partial data set.)



---

[55] Lazarus, Ross et al. Grant Final Report. Grant ID: R18 HS 017045. Electronic Support for Public Health–Vaccine Adverse Event Reporting System (ESP:VAERS). Submitted to The Agency for Healthcare Research and Quality (AHRQ).

[56] https://vaers.hhs.gov/docs/VAERSDataUseGuide_November2020.pdf

1
2

### D. COVID Vaccines Create Immunological Cripples, Vaccine Addicts, Super-Spreaders, and a Higher Chance of Death and Severe Hospitalization

3
4

91.   COVID vaccines are not traditional vaccines.[57]  Instead they cause cells to

5

reproduce one portion of the SARS-CoV-2 virus, the spike protein. The vaccines thus induce the

6

body to create spike proteins. A person only creates antibodies against this one limited portion

7

(the spike protein) of the virus. This has several downstream deleterious effects.

8

92.   First,  these vaccines "mis-train" the immune system to recognize only a small

9

part of the virus (the spike protein). Variants that differ, even slightly, in this protein, such as the

10

Delta variant, are able to escape the narrow spectrum of antibodies created by the vaccines.

11

93.   Second, the vaccines create "vaccine addicts," meaning persons become

12

dependent upon regular booster shots, because they have been "vaccinated" only against a tiny

13

portion of a mutating virus. The Australian Health Minister Dr. Kerry Chant has stated that

14

COVID will be with us forever and people will "have to get used to" taking endless vaccines.

15

"This will be a regular cycle of vaccination and revaccination."[58]

16

94.   Third, the vaccines do not prevent infection in the nose and upper airways, and

17

vaccinated individuals have been shown to have much higher viral loads in these regions. This

18

leads to the vaccinated becoming "super-spreaders" as they are carrying extremely high viral

19

loads.[59]

20

95.   In addition, the vaccinated become more clinically ill than the unvaccinated.

21

Scotland reported that the infection fatality rate in the vaccinated is 3.3 times the unvaccinated

22

and the risk of death if hospitalized is 2.15 times the unvaccinated.[60]

23
24

---

[57] FDA, *Coronavirus (COVID-19) | CBER-Regulated Biologics*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics; FDA, *Coronavirus Treatment Acceleration Program (CTAP)*, https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap.

25
26

[58] https://www.zerohedge.com/covid-19/aussie-health-chief-covid-will-be-us-forever-people-will-have-get-used-endless-booster

27

[59] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3897733

[60] https://jeffreydachmd.com/wp-content/uploads/2021/08/Public-Health-Scotland-21-08-04-covid19-publication_report.pdf, https://jeffreydachmd.com/wp-content/uploads/2021/08/Public-Health-Scotland-21-09-01-covid19-publication_report.pdf

28

### E.     Effective Treatments are Available

#### i.  Ivermectin is Effective

96.     Ivermectin--a cheap, safe, widely available generic medication, whose precursor won the Nobel Prize in Medicine in 2015--treats and cures SARS-CoV-2 infection, both while in the early infectious stage and later stages.[61] The evidence is both directly observed in multiple randomized controlled trials and epidemiological evidence worldwide. There are now more than sixty (60) studies demonstrating its efficacy as well as noting that nations that use ivermectin see their death rates plummet to 1% of the death rates of nations that do not.

#### ii.  Hydroxychloroquine is Effective

97.     Hydroxychloroquine (HCQ) is a cheap, safe, widely available generic medication used billions of times annually in all countries around the world including the United States. It is typically prescribed for rheumatoid arthritis and lupus. HCQ treats and cures SARS-CoV-2 infection effectively in the early infectious stage. HCQ also provides substantial reduction in mortality in later stages.[62],[63] There are now more than 300 studies demonstrating its efficacy and nations that use HCQ have 1-10% of the death rate of nations that do not. HCQ is on the WHO's List of Essential Medications that all nations should always have available. Chloroquine (an earlier version of HCQ) has been in continuous use for SARS-CoV-2 in China since February 2020.[64]

#### iii.Budesonide is Effective

98.     Budesonide, a cheap, safe, widely available generic inhaler medication used commonly in the United States, typically for emphysema, effectively treats SARS-CoV-2 infection while in the early infectious stage.[65] This was published in The Lancet in April 2021.[66]

---

[61] https://ivmmeta.com/ivm-meta.pdf
[62] https://hcqmeta.com
[63] https://docs.google.com/document/d/1vDD8JkHe62hmpkalx1tejkd_zDnVwJ9XXRjgXAc1qUc/edit
[64] https://www.jstage.jst.go.jp/article/bst/14/1/14_2020.01047/_article
[65] https://c19protocols.com/wp-content/uploads/2021/03/COVID_Budesonide_Oxford-Based_Dosing_Guidance.pdf
[66] The Lancet, *Inhaled Budesonide in the treatment of early COVID-19 (STOIC): a phase 2, open-label randomized controlled trial* (July 1, 2021),  https://www.thelancet.com/article/S2213-2600(21)00160-0/fulltext

The trial at ClinicalTrials.gov was stopped early because steroids were shown to be so effective.[67]

### iv. Monoclonal Antibodies are Effective

99.     Monoclonal antibodies are approved for COVID early treatment and are highly effective and universally safe.

### v. Vitamin D is Effective

100.    The evidence is overwhelming that low Vitamin D levels are linked to poor outcomes in COVID-19.[68] Vitamin D therapies are being evaluated in trials by ClinicalTrials.Gov.

### F.     COVID Vaccines Are Harming Many Recipients

101.    The long-established CDC database VAERS (Vaccine Adverse Events Reporting System) demonstrates significantly higher reports of deaths and adverse events with the COVID vaccines than with prior vaccines.[69] There are reports of neurological adverse events, including Guillain-Barre, Bell's Palsy, Transverse Myelitis, Paralysis, Seizure, Stroke, Dysstasia, Aphasia, and Tinnitus, as well as cardiovascular events such as clot and cardiac arrest.

### FIRST CAUSE OF ACTION

### (Violation of the Fourteenth Amendment

### Substantive Due Process Pursuant to 42 USC § 1983)

102.    Plaintiffs refer to all matters contained in paragraphs 1 through 109, hereof and reallege all matters contained therein as though fully set forth at this place.

---

[67] ClinicalTrials.gov, *STerOids in COVID-19 Study (STOIC)* (February 8, 2021), https://clinicaltrials.gov/ct2/show/NCT04416399; The Lancet – Respiratory Medicine, *Inhaled budesonide in the treatment of early COVID-19 (STOIC): a phase 2, open-label, randomised controlled trial* (April 9, 2021) https://www.thelancet.com/article/S2213-2600(21)00160-0/fulltext.
[68] https://pubmed.ncbi.nlm.nih.gov/33316914/ and https://pubmed.ncbi.nlm.nih.gov/33982128/
[69] https://cf5e727d-d02d-4d71-89ff-9fe2d3ad957f.filesusr.com/ugd/adf864_0490c898f7514df4b6fbc5935da07322.pdf
https://wonder.cdc.gov/vaers.html

103.   The Vaccine Mandate violates the liberty protected by the Fourteenth Amendment to the Constitution, which includes rights of self-determination, personal autonomy and bodily integrity, as well as the right to reject medical treatment.

104.   "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 851 (1992).

105.   The ability to decide whether to accept or refuse medical treatment is a fundamental right.

106.   The COVID vaccines are not vaccines, but are, as a factual matter, treatments. They are referred to herein as vaccines, but they are not. They are treatments.

107.   Accordingly, Kaiser's Vaccine Mandate violates the Plaintiffs' constitutional right to decisional privacy with regard to medical treatment.

108.   As mandated medical treatments are a substantial burden, Kaiser must prove that the Vaccine Mandate is narrowly tailored to meet a compelling interest.

109.   No such compelling interest exists because, as alleged above, the COVID vaccines are not effective against the now dominant Delta variant of COVID in that they do not prevent the recipient from becoming infected, getting reinfected, or transmitting COVID to others. Indeed, evidence shows that vaccinated individuals have more COVID in their nasal passages than unvaccinated people do. The Delta variant is the current variant and accounts for over 90% of the COVID infections in the United States at this time.

110.   The COVID vaccines may have been somewhat effective against the original COVID strain, but that strain has come and gone, and the COVID vaccines—designed to fight yesterday's threat—are simply ineffective against the current Delta variant.

111.   Since the COVID vaccines are ineffective against the Delta variant, there can be no compelling interest to mandate their use at this time.

112.   But even if there were a compelling interest in mandating the COVID vaccinations, the Vaccine Mandate is not narrowly tailored to achieve such an interest.

113.    The blanket mandate ignores individual factors increasing or decreasing the risks that the plaintiffs—indeed, all Kaiser employees—pose to themselves or to others.

114.    Kaiser entirely disregards whether employees have already obtained natural immunity despite the fact that natural immunity does actually provide immunity whereas the COVID vaccines do not.

115.    Treating all employees the same, regardless of their individual medical status, risk factors, and natural immunity status is not narrowly tailored.

116.    Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Kaiser from enforcing the Vaccine Mandate.

**SECOND CAUSE OF ACTION**

**(Violation of the Fourteenth Amendment Equal Protection**

**Clause Pursuant to 42 USC § 1983)**

117.    Plaintiffs refer to all matters contained in paragraphs 1 through 1, hereof and reallege all matters contained therein as though fully set forth at this place.

118.    The Equal Protection Clause prohibits classifications that affect some groups of citizens differently than others. *Engquist v. Or. Dept. of Agric.*, 553 U.S. 591, 601 (2008). The touchstone of this analysis is whether a state creates disparity between classes of individuals whose situations are arguably indistinguishable. *Ross v. Moffitt*, 417 U.S. 600,609 (1974).

119.    Kaiser's Vaccine Mandate creates two classes of Kaiser employees; vaccinated and unvaccinated. The members of one class, the unvaccinated, get suspended without paid and fired in December. They cannot obtain another job in their chosen profession. They cannot advance their careers.  They cannot provide for their families, pay their mortgages, or make a car payment. The other class, the vaccinated, gets to keep their job in their chosen profession, advance their careers, provide for their families, pay their mortgages, and make their car payments.

120.    Yet the situations of these employees are indistinguishable because vaccinated Kaiser employees can become infected with COVID, become re-infected with COVID, and can

transmit COVID to fellow employees, hospital visitors, and patients. The vaccines make no difference in these respects. Their only function is to make symptoms less severe.

121.    Discriminating against the unvaccinated controverts the goals of the Equal Protection Clause – i.e., to abolish barriers presenting unreasonable obstacles to advancement on the basis of individual merit.

122.    Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Kaiser from enforcing the Vaccine Mandate.

**THIRD CAUSE OF ACTION**

**(Violation of Religious Liberty Under the First and Fourteenth Amendments**

**Pursuant to 42 USC § 1983)**

Defendant, as a state actor, has imposed an unconstitutional burden on Plaintiffs' exercise of religion through its imposition of the Vaccine Mandate.   The burden imposed on Plaintiffs' exercise of religious is substantial, in that the Vaccine Mandate *inter alia* affect Plaintiffs' ability to: maintain employment, seek future employment, abide by the principles, beliefs, morals, values, or practices of their religion, ostracizes plaintiffs in society, discriminates against plaintiff because of their religion, and causes other economic and non-pecuniary injuries including the loss of promotional opportunity, benefits and insurance, and causes Plaintiffs to endure mental anguish and emotional distress concerning their ability to abide by their faith and further mental anguish and emotional distress related to fear of physical or mental injury that has been and continues to be directly and proximately caused by the Vaccine Mandate.

**THIRD CAUSE OF ACTION**

**(Declaratory and Injunctive Relief by Individual Plaintiffs under Cal. Constitution)**

123.    Plaintiffs refer to all matters contained in paragraphs 1 through 126, hereof and reallege all matters contained therein as though fully set forth at this place.

124.    The Individual Plaintiffs are employed by Kaiser. They have not taken the COVID vaccine and have not complied with Kaiser's vaccine mandate. They object to the forced medical treatment and object to being compelled to turn over their private medical information to Kaiser as a condition of their employment. They also object to being forced to upload their private medical information through the Fulgent app.

125.    Individuals have a right to privacy under the California Constitution. This state law privacy right, which was added by voters in 1972, is far more comprehensive than the right to privacy (if any) that exists under the Federal Constitution. It is the most comprehensive privacy right in America and has been interpreted by the California Supreme Court to protect both the right to informational privacy and to bodily integrity.

126.    Kaiser employees have a legally protected privacy interest in their bodily integrity and their private medical information. Their expectation of privacy is reasonable. Kaiser's Vaccine Mandate constitutes a serious invasion of those privacy rights, as alleged above. Kaiser's compelled use of the Fulgent app also violates Kaiser employees' rights to informational privacy, as alleged above.

127.    Although Kaiser may argue that the Vaccine Mandate serves a compelling interest, there are feasible and effective alternatives that have a lesser impact on privacy interests. Thus, Kaiser's mandate will not survive strict scrutiny.

128.    On information and belief, Kaiser contends that its mandate does not violate the privacy rights of County employees or satisfies strict scrutiny.

129.    Plaintiffs desire a judicial declaration that Kaiser's Vaccine Mandate is facially unconstitutional because it violates Kaiser employees' right to privacy under the California Constitution.

130.    A judicial determination of these issues is necessary and appropriate because such a declaration will clarify the parties' rights and obligations, permit them to have certainty regarding those rights and potential liability, and avoid a multiplicity of actions.

131.    Kaiser's actions have harmed the Individual Plaintiffs and other employees, as alleged above.

132.     Plaintiffs have no adequate remedy at law and will suffer irreparable harm if the Court does not declare the Vaccine Mandate unconstitutional. Thus, they seek preliminary and permanent injunctive relief enjoining Kaiser from enforcing the mandate.

133.     This action serves the public interest, justifying an award of attorneys' fees under section 1021.5 of the California Code of Civil Procedure.

## **FOURTH CAUSE OF ACTION**

### **(Invasion of Privacy)**

134.     Plaintiffs refer to all matters contained in paragraphs 1 through 126, hereof and reallege all matters contained therein as though fully set forth at this place.

135.     Plaintiffs, and all of them, had a reasonable expectation of privacy in their genetic and medical information, and financial and business affairs, the discovery and exposure of which would be highly offensive to a reasonable person.

136.     Defendants, and all of them, unreasonably and unnecessarily intruded on Plaintiffs' medical, biological, genetic, and financial information through the use of involuntary testing preliminary to mandated vaccination.

137.     As a result of Defendants' unreasonable conduct in accessing said information, Plaintiffs have been harmed and injured to an extent that has not, as yet, been fully quantified. Plaintiffs will seek leave to amend this complaint to allege the full extent of said damage when same has been fully ascertained.

138.     In doing the acts herein complained of the Defendants, and all of them, acted with fraud, oppression, malice, and with a willful and malignant intent to do harm and injury to Plaintiffs, by reason of which Plaintiffs are entitled to receive exemplary and punitive damages to accord with proof adduced at the time of trial.

## **FIFTH CAUSE OF ACTION**

### **(Public Disclosure of Private Facts)**

139.     Plaintiffs refer to all matters contained in paragraphs 1 through 126, hereof and reallege all matters contained therein as though fully set forth at this place.

140.    Defendants received private, biological and genetic information from Plaintiffs by requiring biological tests preparatory for requiring mandatory vaccination as a condition of retained employment. Defendants disclosed the information derived from said tests to Fulgent under a contract that enabled Fulgent to utilize blockchain technology to keep, retain and share said information to unlimited persons and companies unknown, including governmental agencies, without the knowledge, permission or consent of the Plaintiffs. The information derived by the Defendants and disclosed to Fulgent and, through Fulgent, publicly to thousands of persons and companies unknown to Plaintiffs, was private and intended to be kept so, the disclosure of which would be highly offensive to persons of normal sensibility.

141.    Defendants knew or acted with reckless disregard of the fact that the disclosure and dissemination of said information would be highly offensive and damaging to the Plaintiffs and, disregarding their duty, disclosed same.

142.    The information Defendants disclosed was not information of legitimate concern to those who received it and those to whom it was disseminated.

143.    As a result of the Defendants' conduct as herein alleged, Defendants have been harmed and injured to an extent that has not, as yet, been fully quantified. Plaintiffs will seek leave to amend this complaint to allege the full extent of said damage when same has been fully ascertained.

144.    In doing the acts herein complained of the Defendants, and all of them, acted with fraud, oppression, malice, and with a willful and malignant intent to do harm and injury to Plaintiffs, by reason of which Plaintiffs are entitled to receive exemplary and punitive damages to accord with proof adduced at the time of trial.

## <u>SIXTH CAUSE OF ACTION</u>

### (Breach of Security for Computerized Personal Information)

145.    Plaintiffs refer to all matters contained in paragraphs 1 through 126, hereof and reallege all matters contained therein as though fully set forth at this place.

146.     Defendants own computerized data, specifically genetic and medical data related to the Plaintiffs herein, that was represented to be private and protected. In violation of the Defendants' duties under California Civil Code 1798.29 and 1798.82, Defendants allowed said information to be shared with Fulgent that disclosed same to unknown millions of people and organizations through the use of blockchain technology and pursuant to a contract with Kaiser that allowed it to do so.

147.     Defendants knew or acted with reckless disregard of the fact that the disclosure and dissemination of said information would be highly offensive and damaging to the Plaintiffs and, disregarding their duty, disclosed the same.

148.     The information Defendants disclosed was not information of legitimate concern to those who received it and those to whom it was disseminated.

149.     As a result of the Defendants' conduct as herein alleged, Plaintiffs have been harmed and injured to an extent that has not, as yet, been fully quantified. Plaintiffs will seek leave to amend this complaint to allege the full extent of said damage when same has been fully ascertained.

150.     In doing the acts herein complained of, the Defendants, and all of them, acted with fraud, oppression, malice, and with a willful and malignant intent to do harm and injury to Plaintiffs, by reason of which Plaintiffs are entitled to receive exemplary and punitive damages to accord with proof adduced at the time of trial.

### SEVENTH CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress)**

151.     Plaintiffs refer to all matters contained in paragraphs 1 through 126, hereof and reallege all matters contained therein as though fully set forth at this place.

152.     Defendants' imposition of mandatory vaccination in violation of the Plaintiffs' rights under Article 1, Section 1 of the Constitution of the State of California was accompanied by threats by Defendants of retaliation, termination of employment, loss of health and retirement benefits, loss of salary, and destruction of careers. The conduct as herein alleged was extreme

and outrageous and was knowingly and deliberately carried out for purposes of intimidation and coercion to force the Plaintiffs to accede to treatments the Defendants knew, or should have known, were neither fully tested nor safe and to which Plaintiffs had a sincere and deeply held conscientious objection to receiving.

153. As a result of Defendants' extreme and outrageous conduct, the Plaintiffs suffered sleeplessness, anxiety, fear, apprehension, nausea and fatigue, to their damage. Said conduct resulted in extreme emotional distress in the plaintiffs and hard to an extent that has not yet been fully quantified. Plaintiffs will seek leave to amend this complaint to allege the full extent of said damage when same has been fully ascertained. Defendants' conduct was a substantial factor in Plaintiffs' severe emotional distress, as herein alleged.

154. In doing the acts herein complained of the Defendants, and all of them, acted with fraud, oppression, malice, and a willful and malignant intend to do harm and injury to the Plaintiffs, by reason of which Plaintiffs are entitled to receive exemplary and punitive damages to accord with proof adduced at the time of trial.

### **EIGHTH CAUSE OF ACTION**

### **(Intentional Infliction of Emotional Distress)**

155. Plaintiffs refer to all matters contained in paragraphs 1 through 126, hereof and reallege all matters contained therein as though fully set forth at this place.

156. Defendants' disclosure of private genetic and medical information to Fulgent and Fulgent's sharing of same with persons and companies unknown pursuant to its contract with Defendants herein is extreme and outrageous conduct that would be offensive to a person of reasonable sensibility and is deeply offensive to the Plaintiffs herein.

157. As a result of Defendants' extreme and outrageous conduct, the Plaintiffs suffered sleeplessness, anxiety, fear, apprehension, nausea, and fatigue, to their damage. Said conduct resulted in extreme emotional distress in the Plaintiffs and harm to an extent that has not yet been fully quantified. Plaintiffs will seek leave to amend this complaint to allege the full extent of said damage when same has been fully ascertained. Defendants' conduct was a substantial factor in Plaintiffs' severe emotional distress, as herein alleged.

158.    In doing the acts herein complained of the Defendants, and all of them, acted with fraud, oppression, malice, and a willful and malignant intent to do harm and injury to the plaintiffs by reason of which Plaintiffs are entitled to receive exemplary and punitive damages to accord with proof adduced at the time of trial.

### NINTH CAUSE OF ACTION

### (For Declaratory Relief)

159.    Plaintiffs refer to all matters contained in paragraphs 1 through 126, hereof and reallege all matters contained therein as though fully set forth at this place.

160.    Defendants have threatened to demote Plaintiffs and to suspend their employment without pay without due process if they refuse to submit to involuntary vaccination.  Plaintiffs allege that that doing so would be a violation of the contract between the parties that requires that Defendants extend due process, notice and an opportunity to be heard before a neutral arbiter prior to imposing the discipline Defendants threaten.

161.    An actual controversy involving justiciable questions related to this controversy exists related to the rights and obligations of the respective parties.

162.    Plaintiffs seek a judicial declaration that proceeding with the imposition of the threatened employment sanctions without due process is a violation of the contract between the parties and preliminary and permanent injunctions prohibiting Defendants from imposing said employment sanctions without due process.

### TENTH CAUSE OF ACTION

### (For Declaratory Relief)

163.    Plaintiffs refer to all matters contained in paragraphs 1 through 126, hereof and reallege all matters contained therein as though fully set forth at this place.

164.    Defendants have threatened to demote and terminate Plaintiffs from their employment with Defendants because of Defendants' belief that Plaintiffs' physical condition makes them incapable of performing the duties they have performed without vaccination and competently for nearly two years since the COVID pandemic first appeared.  Defendants'

mandatory vaccination is based on Defendants' perception that those who are unvaccinated present a danger of infection to themselves from contact with others and a danger to others from contagion.  As a consequence, it is apparently Defendants' view that without the safety of vaccination, the plaintiffs are not capable of performing their work by reason of their physical condition.

165.    Defendants' threat to terminate the plaintiffs' employment by reason of their physical condition constitutes discrimination on the basis of a perception of disability is a violation of the Americans With Disabilities Act ("ADA"), 42 USC 126 (See, especially, Sections 12102(3), forbidding discrimination on the basis of a person being regarded as having an impairment, and Section 12112, forbidding any impairment in the terms of employment of an individual on the basis of a perception of impairment.).

166.    An actual controversy involving justiciable questions related to this controversy exists related to the rights and obligations of the respective parties with respect to the Americans With Disabilities Act.

167.    Plaintiffs seek a judicial declaration that proceeding with the imposition of the threatened employment sanctions is a violation of the ADA and seek an order restraining and enjoining Defendants from violation of the ADA by employment sanction on the basis of perceived physical disability.

## **ELEVENTH CAUSE OF ACTION**

### **(For Declaratory Relief)**

168.    Plaintiffs refer to all matters contained in paragraphs 1 through 126, hereof and reallege all matters contained therein as though fully set forth at this place.

169.     As alleged hereinabove, the currently available COVID "vaccines" are not, in fact, vaccines as that term has been defined for decades by the federal government and in the English language. The currently available "vaccines" are, as alleged hereinabove, "treatments", as that term is currently defined and has been defined for decades. Accordingly, Plaintiffs have a constitutionally protected right to decline unwanted medical treatment and Defendants' threat  to

demote and terminate Plaintiffs from their employment with Defendants because of Plaintiffs' declination of current COVID treatments is contrary to law and to the constitutionally protected right to decline treatment employing the currently available COVID "vaccines". (*Cruzan v. Director, Missouri Department of Health* (1990) 497 U.S. 261 ("*Cruzan*")).

170.    Defendants' threat to demote and terminate the Plaintiffs' employment by reason of there is in violation of law and the Constitution.

171.    An actual controversy involving justiciable questions related to this controversy exists related to the rights and obligations of the respective parties with respect to whether or not the Plaintiffs' right to refuse treatment prohibits Defendants from demoting or terminating the employment of Plaintiffs as a consequence of Plaintiffs' refusal to submit to unwanted medical treatment.

172.    Plaintiffs seek a judicial declaration that proceeding with the imposition of the threatened employment sanctions is a Plaintiffs' constitutionally protected right to refuse treatment is prohibited under *Cruzan* and seek an order restraining and enjoining Defendants from violating Plaintiffs' rights under the Constitution and the authority of *Cruzan* and prohibiting Defendants from imposing any employment sanctions against Plaintiffs as a result of the Plaintiffs' refusal to submit to unwanted medical treatment.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment in their favor and against Defendants as follows:

ON THE FIRST CAUSE OF ACTION

1.    Temporary, preliminary, and permanent injunctive relief restraining Kaiser from enforcing the Vaccine Mandate;

2.    For an award of damages according to proof;

3.    For an award of punitive and exemplary damages; and

4.    For reasonable attorneys' fees.

ON THE SECOND CAUSE OF ACTION

1.      Temporary, preliminary, and permanent injunctive relief restraining Kaiser from enforcing the Vaccine Mandate;

    2.      For an award of damages according to proof;

    3.      For an award of punitive and exemplary damages; and

    4.      For reasonable attorneys' fees.

ON THE THIRD CAUSE OF ACTION

    1.      A judicial declaration that the County's Covid-19 vaccine mandate is facially unconstitutional because it violates County employees' right to privacy under the California Constitution; and

    2.      Preliminary and permanent injunctive relief enjoining the County from enforcing the mandate.

ON THE FOURTH CAUSE OF ACTION

    1.      For an award of damages according to proof; and

    2.      For an award of punitive and exemplary damages.

ON THE FIFTH CAUSE OF ACTION

    1.      For an award of damages according to proof; and

    2.      For an award of punitive and exemplary damages.

ON THE SIXTH CAUSE OF ACTION

    1.      For an award of damages according to proof; and

    2.      For an award of punitive and exemplary damages.

ON THE SEVENTH CAUSE OF ACTION

    1.      For an award of damages according to proof; and

    2.      For an award of punitive and exemplary damages.

ON THE EIGHTH CAUSE OF ACTION

    1.      For an award of damages according to proof; and

    2.      For an award of punitive and exemplary damages.

1   ON THE NINETH CAUSE OF ACTION

2       1.      A judicial declaration that proceeding with the imposition of the threatened

3   employment sanctions without due process is a violation of the contract between the parties; and

4       2.      Preliminary and permanent injunctions prohibiting Defendants from imposing

5   said employment sanctions without due process.

6   ON THE TENTH CAUSE OF ACTION

7       1.      A judicial declaration that proceeding with the imposition of the threatened

8   employment sanctions is a violation of the ADA; and

9       2.      An order restraining and enjoining Defendants from violation of the ADA by

10  employment sanction on the basis of perceived physical disability.

11  ON THE ELEVENTH CAUSE OF ACTION

12      1.      A judicial declaration that proceeding with the imposition of the threatened

13  employment sanctions is a violation of Plaintiffs' constitutionally protected right to refuse

14  treatment is prohibited under *Cruzan*; and

15      2.      An order restraining and enjoining Defendants from violating Plaintiffs' rights

16  under the Constitution and the authority of *Cruzan* and prohibiting Defendants from imposing

17  any employment sanctions against Plaintiffs as a result of the Plaintiffs' refusal to submit to

18  unwanted medical treatment.

19  ON ALL CAUSES OF ACTION

20      1.      For judgment in favor of Plaintiff;

21      2.      For costs of suit herein; and

22      3.      For such other and further relief as the Court may deem just and proper.

23  Respectfully Submitted,

24
25  Dated:  October 6, 2021                    JW HOWARD/ ATTORNEYS, LTD.

26                                      By:

27                                          JOHN W. HOWARD
                                            Attorneys for Plaintiffs
28